*Law Library*

IN THE SUPERIOR COURT OF GUAM

2012 JUL 24 PM 1: 56

| | |
|---|---|
| JWS REFRIGERATION & AIR CONDITIONING, LTD., ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> MALCOLM CAIN, SIMPSON AIR ) CONDITIONING, AAON, INC., AAON ) INTERNATIONAL, ANDREW BILLOK ) personally and in his capacity as a ) representative of AAON, INC., THERMAL ) SUPPLY, INC., and RANDY ASA ) personally and in his capacity as a ) representative of THERMAL SUPPLY, INC., ) <br> ) <br> ) <br> Defendants.) | CIVIL CASE NO. CV1506-07 <br><br> **FINDINGS OF FACTS AND CONCLUSIONS OF LAW** |

This matter came on for bench trial on January 19, 20 and 25, 2012, before the HONORABLE JUDGE ELIZABETH BARRETT-ANDERSON[1]. Plaintiff was present through its President John Scragg, (hereinafter referred to as "JWS") and was represented by Attorney G. Patrick Civille, and Attorney Joyce Tang. Defendants Andrew Billok, and AAON International ("AJB") were not present[2] and not represented at trial. Defendant Malcolm Cain ("Cain") and Simpson Air Conditioning ("SAC") were present and represented by Attorney Seaton M. Woodley, III. Defendants Thermal Supply, Inc. ("Thermal Supply") and Randy Asa (collectively referred to as "TSI") were represented by Attorney Mitchell F. Thompson.

The Court having considered the evidence, including the testimony of all witnesses and exhibits; and further having considered the oral arguments, post trial briefs, hereby enters the following Findings of Fact and Conclusions of Law. To the extent that Findings of Facts

---

[1] After Trial Judge Barrett-Anderson retired, and was appointed Senior Judge Pro Tempore.
[2] In a letter filed with the Court on January 9, 2012, Billok wrote the Court and indicated that he may not appear at trial.

stated may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent that matters expressed as Conclusions of Law may be considered Findings of Fact, they shall also be deemed Findings of Fact.

## PART I

## PROCEDURAL BACKGROUND

This case was initiated on December 14, 2007. A First Amended Complaint ("FAC") was filed by JWS on December 10, 2008, for Breach of Contract; Breach of Fiduciary Duty; International Interference with Prospective Economic Advantage ("IIPEA"); Negligent Interference with Prospective Economic Advantage ("NIPEA"); Unfair Competition; Misappropriation of Trade Secrets, and Breach of the Duty of Good Faith and Fair Dealing.

The trial involved a dispute between JWS and Defendants related to bids for the Guam Schools Project involving public works on various schools: (1) University of Guam Lecture Hall; (2) Liguan and Adacao Elementary Schools; (3) Astumbo Middle School, and (4) Okudu High School.

On February 24, 2010, the Court granted TSI's Motion for Summary Judgment and dismissed the XII Cause of Action for Breach, and the XIV Cause of Action for NIPEA.

On August 19, 2010, the Court granted AJB's Motion for Summary Judgment and dismissed the XI Cause of Action for NIPEA. Further, the Court granted Summary Judgment in favor of Defendant Billok and dismissed the X Cause of Action for IIPEA, but denied summary judgment for AJB in the same Cause of Action.

On December 2, 2010, Judgment was entered in favor of Defendant AAON International's Counterclaim for Breach of Contract in the amount of $20,644.72. The Judgment was appealed on December 20, 2010.

The Court dismissed the III Cause of Action for NIPEA against Cain in the Amended Complaint.

# FINDINGS OF FACT

## A. Significant Parties To The Dispute

1. JWS is a corporation duly formed, organized and doing business in Guam. Its principal place of business is in Guam.

2. Cain is a New Zealand citizen living in Australia. Cain was the former general manager of JWS between December 13, 1999 until September 6, or 27, 2006. First Am. Compl., ¶¶ 19, 28 (Dec. 10, 2008).

3. Simpson Air ("SAC") is a foreign corporation organized and existing under the laws of Australia, formed on or about September of 2006, and is not licensed to do business on Guam.

4. Cain was a part owner of SAC at times relevant to the actions alleged in the Complaint. SAC was sold sometime in 2008 or 2009. Cain now works for Superior Air Solutions, which is principally owned by his wife. Cain conducts business from Australia.

5. AAON International, Inc. is a corporation organized and existing under the laws of Florida.

6. Billok is a United States Citizen, and the President of AAON International, Inc., which is doing business as AJB Associates, Inc. (collectively Billok and AAON International, Inc. are hereinafter referenced as "AJB").

7. Randy Asa ("Asa") is a United States Citizen, and at all times relevant is a resident of Washington. Asa is an employee of Thermal Supply Inc.

8. Thermal Supply Inc. ("TSI") is a corporation duly formed and organized under the laws of Washington.

9. TSI did business on Guam exclusively through its on-island representative, Asa.

## B. **The Guam Schools Project and Bidding Process**

1. The Guam Schools Project (hereinafter "Schools Project") was a design-build project owned by the Guam Educational Financing Foundation ("GEFF") for the construction of five (5) public schools on Guam The project developer was a group by the

name of Facility Group. The controversy between the JWS and the Defendants relates to the award through a private competitive bid solicitation for the following public works projects: (1) University of Guam Lecture Hall, (2) Liguan and Adacao Elementary Schools, and (3) Astumbo Middle School (hereinafter collectively referred to as "Schools Project"), involving design build specifications for HVAC AAON and Goodman products.

2. JWS was the exclusive sales representative on Guam for AAON products from July 2004 to November 2007. Pl.'s Tr. Ex. "5." Depo. Andrew Billok at pg. 48. Ex "F, E, H"

3. Cain began working for JWS sometime in 1999. Cain signed the receipt of the JWS Policy Handbook on July 2, 2004. Pl.Tr. Ex. "A." Paragraph 18 of the `Policy Handbook stated: "...all JWS matters are proprietary in nature and to be held in the strictest of confidence...while in our employ or after without the expressed con(s)ent of the President of JWS..." Cain signed and acknowledged this policy. Cain was the General Manager of JWS during the design build phase involved in the present controversy.

3. JWS was the only heating-ventilation-and cooling ("HVAC") contractor on the Facility Group design team. For over two (2) years JWS, through Cain, worked to incorporate AAON and Goodman HVAC equipment and products into the design build specifications for the Schools Project.

4. Instillation and material prices for the design build specifications was not public information or available to everyone working at JWS, nor was it available to other members of the design team. JWS' pricing practices were confidential and couldn't be disclosed without the express consent of the President of JWS. Pl.Tr.Ex. "D."

5. After completing his work on the design build, Cain resigned from JWS's on September 8, 2006. [Pl.Tr. Ex. "DD"] He formed a company called Simpson Air Conditioning ("SAC"), a New Zealand company not license to do business on Guam.

6. GEFF decided not to enter into a construction contract with the Facility Group as the prime contractor, and instead awarded the contract Core Tech International ("Core Tech") to build several public schools in the summer of 2006. Def. Tr. Ex. "23".

4.    As the General Contractor for the Schools Project, Core Tech, using the Facility group HVAC design build specifications approved by the GEFF, solicited bids for HVAC products from several on island companies, including JWS, SAC, Carrier and Trane.

5.    Cain met with the General Manager of Core Tech sometime around the period he left JWS to inform Core tech he was leaving Guam, and was going to open his own his own air conditioning company. Based on this information that Core Tech solicited a bid from Cain.

6.    JWS submitted its HVAC bid on October 3, 2006, for only two elementary schools, Adacao and Liguan, in the total sum of $1,076,000. Pl. Tr. Ex. "FF". JWS did not bid on any other school.

7.    On October 31, 2006, having left JWS's employment in early September 2006, Cain's new company, SAC, submitted a bid for the same two (2) schools (Adacao and Liguan). Cain also informed Core Tech that his bid included a special price factor that was also given to JWS of .385%, as opposed to the normal price factor of .420%. Pl. Tr. Ex. "II"

8.    Core Tech awarded a Purchase Order to SAC for its bid on Adacao and Liguan Schools on November 16, 2006, for the total sum of $359,593.60[3]. Pl. Tr. Ex. "KK."

9.    There was evidence that after receipt of both JWS and SAC's bids Core Tech, upon instructions from GEFF to reduce overall construction costs, was considering substituting AAON products with a less expensive foreign made product. JWS succeeded in convincing Core Tech to stick to the original design build specifications for AAON products thus putting both JWS and AJB in a good position for the award.[4] Pl. Tr. Ex. "LL."

10.    Between November 16-20, 2006, JWS and Billok exchanged correspondences. JWS informed Billok that Core Tech intended to purchase AAON products from SAC. JWS expressed its concern to Billok that if SAC succeeded in buying and bringing AAON equipment to Guam it would not bode well for their business relationship under the

---

[3] Revised on May 2, 2007, to $354,030.00 to reflect elimination of smoke detectors. Pl. Tr. Ex. "CCC"
[4] JWS's effort to keep AAON products in the design occurred just prior to Core Tech's Nov. 16th award to SAC.

exclusive distributorship agreement. Exs. "LL", "MM", "NN." By this time SAC had already secured the award for Liguan and Adacao from Core Tech[5]. (see ¶14)

11.     SAC also bid on Astumbo Middle School for AAON and Goodman products, and Core Tech issued a Purchase Order award to SAC on April 18, 2007, for the total sum of $251,021.00[6]. Pl. Tr. Ex. "AAA."

12.     According to the testimony of Mr. Ho Eun, General Manager of Core Tech, JWS was not awarded the bid for Adacao and Liguan because JWS's bid was the highest, although it did meet bid specifications including the five (5) year warranty. Mr. Ho Eun, testified that had he known that JWS was the exclusive distributor for AAON products on Guam it was "possible" to negotiate with JWS, although Mr. Eun stated it would have been very difficult because JWS's price margin was very high. Core Tech also stated that only the GEFF could have changed the HVAC specifications, which it did not, therefore AAON and Goodman were still required under the bid.

13.     Mr. Ho Eun, and Mr. Jung Won, both of Core Tech, testified they did not know JWS was the exclusive distributor for AAON products on Guam.

14.     AJB is a manufacturer's representative of AAON Inc, distributing HVAC products. AJB appointed JWS as its "authorized" exclusive distributor of AAON products for the Guam on July 14, 2004. Trial Exs. "E." Deposition of Andrew Billok, at pg. 48. Throughout the course of its business relationship with JWS, AJB would refer any inquiry or request for AAON products on Guam to JWS under its exclusive distributorship agreement. During the course of the design build for the Schools Project, Cain developed a personal and professional relationship with Billok of AJB, which extended to SAC during its bid for Adacao and Liguan. Pl. Tr. Exs. "Y" and "Z."

15.     On April 30, 2007, shortly after SAC had been awarded the contract for Astumbo Middle School (see ¶11) Billok wrote to Cain requesting that their business dealing "not be publicized." In response Cain informed Billok he would be placing an "order" for

---

[5] There is no direct evidence that AJB was aware of the award in early November 2006.
[6] Revised on May 2, 2007, to $245,060.00 to reflect elimination of smoke detectors. Pl.Tr.Ex. "CCC"

AAON products based on soon to be revised purchase orders from Core Tech (see footnote #3)[7]. Pl. Tr. Ex. "BBB." Pl. Tr. Ex. "UU."

16. AJB paid SAC $83,390.00, and Cain requested that this payment be deposited in a joint personal account with his wife to cover advances they made to SAC for shipment of Goodman products. Pl. Tr. Ex. "OOO."

17. The relationship between Billok and JWS soured through the course of 2007, and on November 19, 2007 Billok terminated its exclusive distributorship with JWS. Pl. Tr. Ex. "NNN."

18. AJB made Cain a representative in Australia for AAON products sometime in the summer of 2006.

19. Regarding Goodman products, JWS was an associate distributor for Goodman products through TSI and its representative agent, Asa.

20. TSI did not have an exclusive distributorship with JWS for Goodman products, and there was no exclusive on-going relationship between the parties. *See* Decision & Order, dated Feb 24, 2010, ¶¶ 27-28. TSI did business on Guam through its on-island representative, Asa, was not, and is not now, a license corporation on Guam at the times relevant herein. TSI has never had an office on Guam. TSI publishes its pricing sheets, and does not have any exclusivity with contractors.

21. Cain solicited the assistance of Asa for price quotes on Goodman products for its bids to Core Tech. Def. Tri. Ex. "38"

22. TSI sold Cain and SAC Goodman products on its bid to Core Tech. The total TSI received from Core Tech was $140,164.00; $79472.96 due TSI, and $60,691.04 was SAC's portion[8]. Core Tech paid the entire amount to TSI to assure no liens would arise against the general contractor, and in turn TSI paid SAC.

---

[7] This Exhibit strongly suggests that Billok/AJB were in "business dealings," with SAC/Cain for the sale of AAON products in the time period immediate preceding the weeks and months before April 30, 2007, in breach of its exclusive distributorship agreement with JWS.
[8] Dan More, Co-President of TSI, testified that the $60,691.04 would have been booked as an overpayment, and forwarded to Cain as his share of the profit.

23. Cain could not purchase the products from TSI directly because he had no established credit with TSI. Asa assisted Cain to get TSI to accept Core Tech's line of credit to consummate the sale. See Exhibit EEE.

24. Asa gave Cain a pricing rebate for Goodman products, which was the same pricing rebate available only to JWS and no other company on Guam. Cain used this advantage to prepare his bid on the Schools Project in addition to JWS's confidential information.

25. Asa did not mention to JWS that Cain was negotiating prices for Goodman products to bid on the Schools Project from TSI. JWS found out independently about the negotiations. See Exhibit LL.

# PART III

## CONCLUSIONS OF LAW

This Court has jurisdiction to hear and determine the claims of this lawsuit pursuant to 7 GCA §3105 (2010).

**1. Breach of Contract – Confidentiality Agreement Against Cain (Count I).**

This is an equitable remedy. JWS alleges Cain breached "the confidentiality duties in JWS' Personnel Handbook [that] were part and parcel of Cain's employment contract with JWS..." First Am. Compl. at ¶ 45. JWS alleges that Cain used proprietary and confidential information in SAC's bid for the Schools Project.

The JWS Policy Handbook required all employees to keep all confidential information:

> Employees should be aware that all JWS matters are proprietary in nature and to be held in the strictest confidence. Engineering practices, pricing practice and procedures for use by JWS are totally proprietary and any use by employees while in our employ or after without the expressed content of the President of JWS for another other purpose will be prosecuted to the fullest extent of the law. This will include knowledge or possession of any documents or records owned or created by JWS in its operations. See Exhibit A.

Guam courts have upheld contract provisions intended to protect trade secrets or confidential information. *See, e.g. Lubasan v. Document Handling Ltd., Inc., Superior Court of Guam Civil Case No. CV0912-88* (Decision and Order, December 5, 1990). This view is consistent with that in other jurisdictions since the mid-1800s.[9] Non-disclosure or confidentiality agreements have been upheld even where, as here, they do not limit the duration of the agreement. *Sigma Chemical Co. v. Harris,* 586 F.Supp. 704, 710 (D.C.Mo.,1984) (citing *Nucor Corp. v. Tennessee Forging Steel Service, Inc.,* 476 F.2d 386 (8th Cir.1973) ("[D]efendant points to the covenant not to reveal trade secrets and argues that, in fact, there is *no* time limit. This argument lacks merit because an employee has an absolute, temporally unlimited duty not to disclose his/her employer's trade secrets and thus the absence of a time limit is not a defect). Confidential information that may not technically constitute trade secrets is nonetheless protected. See, *Nucor Corp. v. Tennessee Forging Steel Service, Inc..* 476 F.2d 386, 392 (C.A.1973) (citing Restatement 2d Torts §§395[10]) ("[E]mployees have a

---

[9]  *See e.g. Empire Steam Laundry v. Lozier,* 165 Cal. 95, 99, 130 P. 1180, 1182 (Cal.1913) ("[T]he court finds that the [confidentiality] contract between these parties was freely and voluntarily entered into and that it was not in restraint of trade, but into this question it is wholly unnecessary to enter. For the judgment of the court does not rest alone upon its findings as to the validity of the contract, but declares a violation of plaintiff's rights under circumstances cognizable in equity, without any express contract whatsoever upon the subject"); *O. & W. Thum Co. v. Tloczynski,* 114 Mich. 149, 72 N.W. 140 (Mich. 1897) (holding that a condition of a contract of employment that an agent will never make use of or divulge trade secrets necessarily confided to him by the principle in the conduct of the business is not invalid as being in restraint of trade); *Peabody v. Norfolk,* 98 Mass. 452, 458, 1868 WL 5299, 5 (Mass.) (Mass. 1868) ("If he invents or discovers, and keeps secret, a process of manufacture … he has a property in it, which a court of chancery will protect against one who in violation of contract and breach of confidence undertakes to apply it to his own use, or to disclose it to third persons"); *Zep Mfg. Co. v. Harthcock,* 824 S.W.2d 654, 663 (Tex.App.-Dallas,1992) ("Nondisclosure covenants…do not necessarily restrict a former employee's ability to compete with the former employer…The nondisclosure covenant prevents only the disclosure of trade secrets and confidential information acquired by the former employee").

[10]  The Restatement (Second) of Agency provides in relevant part:

§ 395 . *Using or Disclosing Confidential Information*

Unless otherwise agreed, an agent is subject to a duty to the principal not to use or to communicate information confidentially given him by the principal or acquired by him during the course of or on account of his agency or in violation of his duties as agent, in competition with or to the injury of the principal, on his own account or on behalf of another, although such information does not relate to the transaction in which he is then employed, unless the information is a matter of general knowledge.

high duty not to disclose confidential information received by them as employees to competitors regardless of the fact that the information disclosed might not technically be considered a trade secret").

Cain signed the Handbook attesting to his receipt, understanding and acceptance of the conditions. As the General Manager of JWS, Cain's position gave him unfettered access to a wide range of confidential information, such as distributorship pricing, and specific information that was used for bids and proposals, to which only a handful of managerial-level employees within JWS had access. Cain's position required that he be involved in developing bids, attending design and construction meetings, and supervising and finalizing bids and proposals. Cain was privy to distributor pricing, including the unique .385 multiplier JWS successfully negotiated for the Schools Project. Cain knew exactly what JWS' markup was going to be if it bid on the Schools Project having participated in developing the design build specifications. Knowing the amount and structure of the JWS bid, Cain was equipped to secure the winning bid from Core Tech.

Cain's bid was based on pricing factors he had previously negotiated with JWS suppliers on behalf of JWS. Specifically, Cain had negotiated a special .385 multiplier for pricing on AAON products with AJB, as opposed to the .42 multiplier AJB ordinarily provided to sales representatives. Cain would not have been aware of the special multiplier had he not negotiated it himself while at JWS. Cain's bid expressly included a contractor's rebate from TSI on Goodman products, a rebate successfully negotiated by JWS on the Schools Project. Without accessing these discounts, it is unlikely that Cain could have purchased the products for the same distributor pricing JWS used in preparing its bids.

The Court finds Cain breached his duty of confidentiality, and finds Cain liable under Count I.

**2.** **Intentional Interference with Prospective Economic Advantage (IIPEA) Against Cain (Count II); Against SAC (Count VII), Relating to the Schools Project.**

JWS causes of action for IIPEA against Cain and SAC[11] allege wrongful conduct which disrupted its economic advantage with Core Tech in the bid solicitation for the Schools Project.

The tort of intentional interference with prospective economic advantage requires proof of the following: 1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; 2) the defendant's knowledge of the relationship; 3) intentional wrongful acts on the part of the defendant designed to disrupt the relationship; 4) actual disruption of the relationship; and 5) economic harm to the plaintiff caused by the wrongful acts of the defendant. *Della Penna v. Toyota Motor Sales, U.S.A., Inc.,* 11 Cal.4th 376 (Cal.1995); *Korea Supply Co. v. Lockheed Martin Corp.,* 63 P.3d 937 (Cal.2003). The Supreme Court of California in *Della Penna* (1995) while formulating the elements of this common law tort cautioned, "Ours is a competitive economy in which business entities vie for economic advantage...We have been cautious in defining the interference torts, to avoid promoting speculative claims. Given the criticism of these causes of action and the dangers inherent in imposing tort liability for competitive business practices." *Id.* The elements of IIPEA have their roots in the *Restatement 2d Torts* for intentional interference with contractual relationship.[12] The Supreme Court of California in *Della Penna,*

---

[11] Cain is the President of SAC, therefore, any knowledge that Cain had can be imputed to SAC.
[12] Restatement 2d Torts §766B, p. 20:
    One who intentionally and improperly interfered with another's prospective contractual relationship (except a contract to marry) is subject to liability to the other for pecuniary harm resulting from loss of the benefits of the relationship, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation, or (b) preventing the other from acquiring or continuing the prospective relation.

and again eight years later in *Korea Supply*, recognized the faint distinction in legal analysis between the two types of torts, and the commonality of their elements, but nonetheless found them distinct causes of action in the context of an open competitive economy.

> "We reiterate our statement in *Della Penna* that 'our courts should firmly distinguish the two kinds of business contexts, bringing a greater solicitude to those relationship that have ripened into agreements, while recognizing that relationships short of that subsist in a zone where the rewards and risks of competition are dominant" *Id*. p.12

This Court recognizes the competitive backdrop in the instant case.

The distinction between the two common law torts is that IIPEA requires proof of an intentional wrongful act on the part of the defendant designed to disrupt the known relationship between the plaintiff and the third party. The Supreme Court of California first announced its ruling on this common law tort in *Buckaloo v. Johnson* (1975) 14 Cal.3d 815, which promptly became the leading authority. Two decades later the elements of a prima facie case of IIPEA is no less incoherent and vague.[13] At odds with the doctrine is support for freedom of trade, freedom of speech, and freedom of competition. Justice Mosk quoting Prosser in *Della Penna*, stated,

> " 'The policy of the common law has always been in favor of free competition which proverbially is the life of trade. So long as the plaintiff's contractual relations are merely contemplated or potential, it is considered to be in the interest of the public that any competitor should be free to divert them to himself by all fair and reasonable means ... In short, it is no tort to beat a business rival to prospective customers. Thus, in the absence of prohibition by statute, illegitimate means, or some other unlawful elements, a defendant seeking to increase his own business may cut rates or prices, allow discounts or rebates,enter into secret negotiations behind the plaintiff's back, refuse to deal with him or threatens to discharge employees who do, or even refuse to deal with third parties unless they cease dealing with the plaintiff, all without incurring liability'"

---

[13] Concurring opinion Justice Mosk, *Della Penna, supra* at p. 14.

There is generally consensus that one who commits an interfering act under wrongful motives should not be allowed to interfere with impunity at all times and under all circumstances. An unlawful act can satisfy the element of wrongfulness. It is the independently wrongful act requirement which makes the interference tortuous and, therefore, actionable. An employee of Defendant in *Korea Supply* engaged in bribery and offered sexual favors to key Korean officials in order to obtain the contract. An act is independently wrongful if accomplished through unlawful means. *CRST Van Expedited, Inc. vs. Werner Enterprises, Inc.* 479 F.3d. 1099, 9th CA (2007) (Defendant's violation of California's Unfair Competition Law provided the basis for wrongful conduct.) It is not required that the disruptive act be committed by unlawful means. *San Jose Construction vs. S.B.C.C.*, 155 Cal.App 1528 (2007) (Former employee of plaintiff, hired by defendant, had accumulated non-secret knowledge about the projects and could reasonably expect subcontractors to give defendant with same prices they had provided to plaintiff.)

Specific intent is also not required to prove IIPEA. A plaintiff need not plead that the defendant acted with the specific intent or purpose to interfere with the plaintiff's business expectancy in order to state a claim for this tort, it can be established by showing, inter alia, a disruption with a contract which is certain to be consummated. *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937 (Cal.2003).

In the instant case JWS submitted a bid to build the Schools Project creating the probability of future economic benefit. A bid relationship existed between JWS and Core Tech on the schools which JWS actually submitted bids for. Cain worked for JWS for seven (7) years in a management capacity, and was fully aware of JWS' pricing and distributorship relationship with AJB. The evidence also shows that Cain had intimate knowledge of the

details of the design build, and knew that JWS would bid for AAON products after years of effort. Although Cain knew that JWS was the exclusive distributor of AAON products on Guam.

After Cain left JWS he opened SAC in Australia, and used his new company to bid on the Schools Project. He met with Core Tech before leaving Guam to inform them he was opening his new company dealing in air conditioning. He never obtained a foreign corporation license to do business here on Guam, in violation of Guam law.[14] Cain did not pay local taxes. This put JWS in an unfair competitive position.

No other local company was authorized to sale AAON products on Guam. JWS had the exclusive distributorship for AAON products on Guam. JWS invested enormous amounts of time and money for over two years to secure inclusion of AAON products into the design build for the Schools Project, even to the point of encouraging Core Tech to stick with AAON rather than substitute for a less expensive product. Since Core Tech did not opt to substitute with cheaper products, there was a reasonable probability that Core Tech could have contracted with JWS, Cain never told Core Tech of JWS' exclusive distributorship agreement with AJB. Mr. Eun testified that had he known of JWS' distributorship agreement he would have checked with Cain, and as a good businessman he would have honored the distributorship. *See* ¶ B(12).

The evidence shows that Cain was in continuous communication with Billok after SAC submitted its bid and up through award. Cain induced AJB to deal with SAC directly on the fear that AJB would completely lose out on the Schools Project if it didn't deal with SAC because Core Tech was not going to award to JWS based on its high bid. Cain interfered by

---

[14] Title 18 G.C.A. §7102(a) "A foreign corporation shall not transact business in Guam until it obtains both a business license and a certificate of authority to do so from the Director of Revenue & Taxation."

submitting a bid in the first instance, and by inducing AJB to breach its excusive agreement with JWS.

The Court finds that Cain acted wrongfully by: 1) not obtaining a foreign corporation license to do business on Guam; 2) not informing Core Tech in the first instance that SAC was not business licensed to do business on Guam; 3) failing to advise Core Tech of the exclusive distributorship agreement between AJB and JWS; 4) submitting a bid with undercut prices for AAON products based on prior confidential information attained while in the employment of JWS, and 5) inducing AJB to ignore its exclusive distributorship agreement with JWS on the belief that if AJB did not do business with SAC it would lose out completely on the Schools Project contract with Core Tech.

The analysis does not end with the Court's determination of Cain and SAC's wrongful conduct. The Court must further determine whether the wrongful conduct was the cause of JWS's harm. *Guam Paradise Company v. Mitsubishi Corp., LTD* 1992 WL 245660 (D.Guam) [The undisputed cause in fact for the Port Authority of Guam ("the Port") not awarding the contract to plaintiff was its high bid and substantial non-conformance, causing the Port to reject all bids.] Did JWS simply out-price itself in this competitive bid? This has been one of the most difficult issues in the instant case.

The Supreme Court of California, post *Della Penna* and *Korea Supply*, talks little about causation, so much so that it almost appears that causation is no longer a critical element as long as there is a finding of "wrongfulness." It would seem unjust to permit a tortious wrongdoer to escape liability in situations where, knowing how to undercut his competitor, he submits the lowest bid. A wrongdoer, armed with competitive information, will always be able to undercut his competitor, leaving causation an easy target. On the other hand, as in *Guam*

*Paradise,* where the solicitor rejects all bids or cancels the solicitation altogether, the wrongful act becomes less of a casual factor, and therefore the plaintiff's own actions should be reviewed with a closer eye towards causation. Unfortunately, the whole issue of causation has been overshadowed by discussion of the unprivileged defendant's wrongful conduct, and to the extent that the Superior Court of Guam trial judge in *Guam Paradise* relied on *Buckaloo*, it is questionable after *Della Penna* whether *Buckaloo* is still good law for any discussion of IIPEA.[15]

It is this Court's opinion, based on the testimony of Core Tech, there was a possibility that Core Tech would not have summarily rejected JWS' bid, and based on the exclusive distributorship would have communicated with JWS for possible award. JWS' bid was not the cause of its losses. The Court finds Cain and SAC liable for JWS damages for tortuous interference with the prospective economic advantage with Core Tech as to JWS's bid for Adacao and Liguan Elementary Schools under the theory of IIPEA[16].

### 3. UOG Project. IIPEA Against Cain (Count II); Against SAC (Count VII)

The Complaint alleges that JWS had a prospective economic relationship with UOG and Core Tech for the UOG Project and the Guam Schools Project. First Am. Compl. at ¶ 83. Further, that Simpson Air, through Cain, used JWS' information and trade secrets to obtain the

---

[15] *Della Penn, supra,* Footnote FN5 "To the extent that language in *Buckaloo* , supra, 14 Cal.3d. 815, and *Seaman's, supra,* 36 Cal.3d 752, addressing the pleadings and proof requirements in the economic relations tort is inconsistent with the formulations we adopt in this case, it is disapproved."

[16] JWS did not bid on Astumbo Middle School, or Okudu High School. The Court finds that JWS' failure to bid on these projects was the cause in fact of its losses with respect to Core Tech under IIPEA. Thus, in order to have created the economic relationship with Core Tech, JWS needed to enter a bid.

contract for the Guam Schools Project "and intentionally assisted [a competitor] in obtaining the UOG contract."

The Court finds no evidence that Cain, or SAC through Cain, intentionally assisted JWS' competitor in obtaining the UOG Contract. Therefore, the Court finds that Cain and SAC did not interfere with any prospective economic advantage relating to the UOG Project.

The Court dismisses these Counts against Cain and SAC as they pertain to the UOG project.

### 4. IIPEA Against AJB (Count X).

The FAC alleges AJB wrongfully interfered with the prospective economic advantage between JWS and Core Tech. Pl. 1st Am. Complt. (Dec. 10, 2008) ¶ 89. JWS alleges that AJB "participated in negotiating a bid price for supply of AAON products on the school project with SAC, and in fact offered SAC the same special pricing extended to JWS, in derogation of its exclusive distributorship agreement with JWS" Pl. Tr. Brief (Nov. 29, 2011) ¶ A, p.16. In order to find AJB and Asa liable under IIPEA, JWS must prove the same elements, and meet the same legal standards as discussed in detail under ¶ Part II.

AJB breached its exclusive distributorship with agreement with JWS. Its actions, however, were not tortuous as discussed under the historical development of IIPEA. AJB knew from Cain that there was a risk Core Tech would alter its specification for AAON products in order to reduce costs, and it set about to assure the deal. The only way to do this was to breach its contract with JWS. Breach of an agreement does not become tortuous by the breach itself. There must be some independent wrongful act. While AJB's breach was wrong, it was not wrongful under IIPEA. AJB sought the benefit of the deal through the one company that showed certainty of winning the Schools Project bid. AJB showed no malicious intent. As

stated in *Della Penna, supra*, "Perhaps the most significant privilege or justification for interference with a prospective business advantage is free competition…Ours is a competitive economy in which business entities vie for economic advantage. In a sense, all vendees are potential buyers of the products and services of all sellers in a given line, and success goes to him who is able to induce potential customers not to deal with a competitor." *Buckaloo, supra*, 14 Cal.3d. 815, at pg. 828, (1975), cited with approval, *Della Penna. Id.*

The Court finds that AJB is not liable for damages under IIPEA.

## 5. IIPEA Against TSI and Randy Asa (Count XIII).

The Court previously denied TSI summary judgment on this Count stating "there are material facts in dispute regarding the acts that constituted the alleged disruption of the relationship between Plaintiff and Core Tech, as well as the alleged economic harm caused by Defendant(s) TSI." See Dec. & Or. Mtn. for Sum. Jud. Causes of Action #12-14. (Feb. 24. 2010).

Asa provided price quotations to Cain in the course of the design build with the Facility Group for Goodman product based on TSI pricing, and continued to negotiate with Cain after SAC secured the bid. TSI's act of quoting and selling Goodman products to a competitor of JWS does no constitute an improper or wrongful act under IIPEA. TSI's prices were readily available to its sales representatives, including Asa for the Guam region. There was no exclusivity for Goodman products on Guam. It is not a tort to maximize one's economic interests provided there is no improper or wrongful conduct. There was no wrongful act committed by TSI in providing price information and ultimately selling Goodman product in question to SAC. TSI was free to sell Goodman products to a competitor of JWS. JWS had no

reasonable expectation that it would have received the sole economic benefit of Goodman products on Guam. JWS has failed to prove TSI or Asa acted wrongfully.

The Court finds TSI and Asa not liable for damages under IIPEA, and dismisses Count XIII accordingly.

### 6. Breach of Fiduciary Duties to JWS Against Cain. (Count IV).

JWS alleges Cain is liable for common law breach because an agent of JWS he was "obligated to act in the interest of the principal," and that he "wrongfully, oppressively, and maliciously breached his fiduciary duties to JWS" when he submitted bids on the Schools Project. This is an equitable remedy.

The Restatement (3rd) of Agency, Section 8.01 provides that "an agent has a fiduciary duty to act loyally for the principle's benefit in all matters connected with the agency relationship." *Restatement 3d Agency* §8.01. The duty of loyalty includes the duty to preserve the principal's confidential information, which extends in duration past the termination of the agency relationship.

> An agent's duties concerning confidential information do not end when the agency relationship terminates. An agent is not free to use or disclose a principal's trade secrets or other confidential information whether the agent retains a physical record of them or retains them in the agent's memory. If information is otherwise a trade secret or confidential, the means by which an agent appropriates it for later use or disclosure should be irrelevant. Feats of human memory, however commendable and intriguing in many respects, should not be privileged as instruments of disloyal conduct. *Restatement 3d Agency* § 8.05, cmt. C.

This duty of loyalty arises out of the agency relationship, and exists even in the absence of an express confidentiality agreement. *See, Empire Steam Laundry, supra* at 1182. As General Manager of JWS, Cain owed JWS a common law duty

of loyalty that extended past the termination of his agency relationship with JWS. This fiduciary duty existed even in the absence of a contractual duty.

For the reasons described above, Cain breached his common law fiduciary duty of loyalty to JWS by improperly disclosing and utilizing the confidential information in a manner that injured JWS. Because Cain used confidential information he obtained during his agency relationship with JWS in formulating his competing bid in the Schools Project, he breached both his contractual obligation and his common law fiduciary duty to abstain from disclosing confidential information or misappropriating the same for his own or a competitor's purposes.

The Court finds Cain liable for damages under Count IV.

7. **Unfair Competition and Misappropriation of Trade Secrets: Against Cain (Counts V & VI)**

JWS alleges the common law tort of unfair competition and misappropriation of trade secrets against Cain in that he wrongfully used JWS' confidential information and trade secrets for his benefit.

As discussed above, JWS held certain classes of information confidential and limited access to that information to JWS managers and engineers. Cain was aware that confidential information included pricing, personal information of employees, custom design information, and sealed bids, which included design build equipment, drawing for ducts, installation issues, maintenance issues, warranty issues, and price. Cain also understood that confidential information includes knowledge or possession of any documents or records owned or created by JWS in its operations. Cain and SAC's misappropriation of confidential information belonging to JWS in formulating SAC's bid for the School Project amounted to unfair competition. Because specifications called for AAON products, for which JWS was the exclusive distributor, other potential bidders could not expect to meet the requirements for the Schools Project, which

limited Core Tech's exposure as a potential customer. Core Tech never revised the specifications; the project proceeded with AAON specifications. Although a former employee who joins or establishes a competing enterprise may properly solicit business from those he served in this previous employment, "an employee . . . should not be allowed to exploit information which his employer compiled at great expense and which represents a valuable business asset." (Callman (3d ed.) *Unfair Competition Trademarks & Monopolies*, § 52.2(c)(2); Witkin, Equity (8th ed. 1974) s 86.). SAC's use of Cain's improperly gained knowledge regarding special pricing, rebate and warranty information, as well as Cain's direct solicitation of AJB to AAON products in disregard of the distributorship agreement caused JWS to lose profits, both directly and indirectly, on the sale of AAON products on Guam.

Cain and SAC's actions in connection with the sale of the AAON products to Core Tech constitute tortious conduct and a breach of Cain's common law obligations to JWS. This remedy is similar to other equitable remedies heretofore discussed above.

The Court finds Cain liable for damages under Counts V and VI.

**8. <u>Intentional Breach of Contract: Against AJB (Count VIII); Breach of Implied Covenant of Good Faith and Fair Dealing: Against AJB (Count IX).</u>**

The covenant of good faith and fair dealing requires the existence of a contractual obligation between the parties. *See e.g. Quijano v. Atkins-Kroll, Inc.*, 2008 Guam 14; 2008 WL 4862508, 1 (Sup. Ct. Guam 2008) at FN2. That agreement is reflected in the exclusive distributorship, and AJB admits that from 2004 to 2007 it "appointed JWS as a sole sales representative for AAON heating, ventilation and air-conditioning ("HVAC") equipment for the territories of Guam and Micronesia." Def. AAON International dba AJB Ans. & Countercl., 1 ¶ 7 (Feb. 17, 2009). The evidence shows AJB (Billok) intended to sell, and in fact directly sold AAON products to SAC between November 16, 2006, and April 30, 2007, in

breach of the exclusive distributorship agreement with JWS. AJB should have done what it had done in prior instances of AAON products to be sold on Guam; refer the vendor its exclusive distributor, JWS. AJB wanted the Schools Project at all costs. After years of working to secure AAON products into the design build it was not going to lose the project based on JWS out pricing itself, or because of Cain's actions in bidding against JWS. AJB knew that Core Tech wanted to substitute the more expensive HVAC specification with cheaper products from Asia, but was convinced by JWS not to do so. Knowing JWS's bid was much higher than SAC's, it was a possibility that Core Tech would have requested GEFF to rebid with cheaper products. Mr. Eun admitted he would not have accepted JWS's bid because it was too high. AJB took a risky move to assure it got the Schools Project contract even if it meant breaching its agreement with JWS.

The Court finds AJB liable for damages for intentional breach of contract under Count VIII, and further finds AJB liable for breach of the covenant of good faith and fair dealing implied in its exclusive distributorship agreement with JWS under Count IX.

### 9. No Attorney Fees to Any Party.

The American Rule, meaning each party must bear the expense of their own attorney's fees, applies in Guam. *Fleming v. Quigley*, 2003 Guam 4 ¶ 35. All parties prevailed on significant issues in this case, thus attorney's fees should not be awarded. *See Fargo Pacific, Inc., v. Korando Corp.*, 2006 Guam 22 ¶ 53.

### 10. Damages.

Finally, the Court finds that JWS is not entitled to damages related to schools it did not submit bids for. The failure of JWS to submit certain bids is the direct cause of JWS's losses.

## PART IV
## CONCLUSION

Based on the foregoing Findings of Fact and Conclusions of Law the Court concludes as follows for each of the causes of action in the FAC:

   a)  Count I for breach of contract against Cain is **GRANTED.**

   b)  Count II for IIPEA against Cain is **Dismissed** as it pertains to the UOG contract, and is **GRANTED** as it pertains to the Schools Project involving Adacao and Liguan.

   c)  Count III for NIPEA against Cain heretofore **Dismissed**.

   d)  Count IV for *common law* breach of fiduciary duties against Cain is **GRANTED.**

   e)  Count V for *common law* breach of misappropriate of trade secrets against Cain is **GRANTED.**

   f)  Count VI for *common law* breach of unfair competition against Cain is **GRANTED.**

   g)  Count VII for IIPEA against SAC is **Dismissed** as it pertains to the UOG contract, and is **GRANTED** as it pertains to the Schools Project involving Adacao and Liguan.

   h)  Count VIII for breach of contract against AJB is **GRANTED.**

   i)  Count IX for breach of contract against AJB is **GRANTED.**

   j)  Count X for IIPEA against AJB is **Dismissed** as to all schools.

   k)  Count XI for NIPEA against AJB and Billok heretofore **Dismissed.**

   l)  Count XII for breach against TSI heretofore **Dismissed.**

   m) Count XIII for IIPEA against TSI and Asa is **Dismissed.**

n) Count XIV for NIPEA against TSI heretofore **Dismissed.**

## PART V
## DAMAGES

The FAC prays for damages to be awarded for: (a) the I through VI Causes of Action against Cain, (b) the VII Cause of Against SAC, (c) the VIII though X Causes of Action against AJB; (d) the VIII through the IX Causes of Action against Billok; and (e) XIII Cause of Action against TSI in an amount to be proven at trial. JWS's post trial brief prays for an award totaling THREE HUNDRED TWENTY-NINE THOUSAND SIX HUNDRED AND SEVENTY ONE ($329,671.00) DOLLARS. Pl. FoF & Concl. of Law (Feb 27, 2012) ¶¶ 44,45.

The FAC prays for Punitive Damages in the amount of $1,000,000.00 against: (a) Cain for the Second, Fourth, and Fifth Causes of Action; (b) Simpson Air for the Seventh Cause of Action; (c) AJB for the Tenth Cause of Action; and (d) TSI for the Thirteenth Cause of Action.

## PART VI

## AWARD

1. The Court awards damages against Cain, SAC, and AJB jointly and severally for breach of contract claims, and all common law claims, limited to AAON products for Liguan and Adacao Elementary Schools in the total sum of TWO HUNDRED FIFTY THOUSAND ONE HUNDRED AND NINETY-NINE ($250,199.00) DOLLARS.

/  /  /

/  /  /

/  /  /

/  /  /

2. The Court further awards punitive damages against Cain and SAC jointly and severally for their tortious conduct on IIPEA claims in the sum of ONE HUNDRED THOUSAND ($100,000.00) DOLLARS. 20 GCA §2120.

3. JWS is entitled to post judgment interest at 6%.

No further relief is granted.

SO ORDERED: _____ .

_____

HONORABLE ELIZABETH BARRETT-ANDERSON
Senior Judge *Pro Tempore*, Superior Court of Guam

I do hereby certify that the foregoing is a full true and correct copy of the original on file in the office of the clerk of the Superior Court of Guam.

Dated at Hagåtña, Guam

JUL 2 4 2012

Glenric J. Mendiola
Deputy Clerk, Superior Court of Guam